## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO. 1:10-CR-225 (CKK)** |
| | ) | |
| **STEPHEN JIN-WOO KIM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT STEPHEN KIM'S MOTION TO SUPPRESS STATEMENTS AND FOR AN EVIDENTIARY HEARING

Abbe David Lowell, Esq. (DC Bar No. 358651)
Paul M. Thompson, Esq. (DC Bar No. 973977)
James M. Commons, Esq. (DC Bar No. 502790)

**McDERMOTT WILL & EMERY LLP**
600 Thirteenth Street, N.W.
Washington, DC 20005-3096
T:  (202) 756-8000
F:  (202) 756-8087

*Counsel for Defendant Stephen Kim*

# TABLE OF CONTENTS

**Page**

FACTS .................................................................................................................................1

ARGUMENT ......................................................................................................................3

I.      The Questioning Of Mr. Kim Was A Custodial Interrogation. ........................................3

II.     Mr. Kim Did Not Receive Adequate *Miranda* Warnings Before Participating In
The September 24, 2009, Or The March 29, 2010, Interrogations. ..................................6

III.    Mr. Kim Did Not Waive His Constitutional Rights.........................................................8

CONCLUSION ...................................................................................................................9

Defendant Stephen Kim, through undersigned counsel, respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fifth Amendment to the United States Constitution, for an Order suppressing any and all statements allegedly made by him to law enforcement agents in the course of a custodial interrogation as well as any evidence gathered as a result of those statements, and for an evidentiary hearing.

## FACTS

Mr. Kim met with law enforcement agents on at least two occasions, September 24, 2009, and March 29, 2010, in connection with the government's investigation into this matter.

On September 24, 2009, an agent of the Federal Bureau of Investigation ("FBI") called Mr. Kim and asked to meet with him at Mr. Kim's office at the Department of State. Earlier that day, Mr. Kim's employer had informed him that he was being let go for budget reasons. Shortly thereafter, two agents met with Mr. Kim in a sensitive compartmented information facility ("SCIF") at the Department of State. At no point during this encounter did the agents inform Mr. Kim that he was under investigation, that he was free to leave, or that he had the right to have counsel present.

Several months later, at approximately 9:00 AM on March 29, 2010, an FBI agent called Mr. Kim again and asked to meet with him immediately. When Mr. Kim suggested that the agent come to his office, the agent advised Mr. Kim that they needed to meet in a SCIF[1] and suggested that they meet at the Department of Energy ("DoE") headquarters. Mr. Kim inquired about the reason for the meeting, and the agent responded that he was not at liberty to discuss the

---

[1] Because Mr. Kim had been terminated from his employment at the Department of State, he no longer had access to a SCIF.

issue.  When Mr. Kim arrived at DoE headquarters, he was met there by the FBI agent he spoke with over the telephone and a second FBI agent.  The agents escorted Mr. Kim to a SCIF in the basement of the DoE and closed the secured door to the facility.   The agents then proceeded to ask Mr. Kim specific questions pertaining to matters at issue in this case.   The agents aggressively confronted Mr. Kim about certain facts and attempted to coerce him to cooperate by admitting those facts.  At no point during the questioning did either of the FBI agents advise Mr. Kim of his constitutional rights to remain silent and to seek the assistance of counsel, nor did they inform him that he could end the interrogation at any time.

After this first encounter on March 29, 2010, the agents did not relent.  They came to Mr. Kim's home to conduct a search of his premises.  There were approximately six agents at Mr. Kim's home at that time.  That certainly did not make Mr. Kim feel he was "free" to do as he wanted.  While the search proceeded, two FBI agents continued to interrogate Mr. Kim, accusing him of wrongdoing.  Even after the search ended, the two agents remained at Mr. Kim's house, continuing to question him about issues that had already been raised and addressed.  At one point, one of the agents, apparently referring to Mr. Kim's Korean descent, used the phrase "you people[.]"   Once again, at no point during the questioning did either of the FBI agents advise Mr. Kim of his constitutional rights to remain silent and to seek the assistance of counsel.  Nor did they inform him that he could end the interrogation at any time.

Mr. Kim submits that an evidentiary hearing is needed to further develop the facts, which are in dispute and determinative of this motion.[2]

---

[2] Mr. Kim has not had an opportunity to review the FBI 302 investigation reports or the agent notes generated during or after the September 24, 2009, or the March 29, 2010, interrogations, as those materials have not yet been produced in discovery.

**ARGUMENT**

I.      **The Questioning Of Mr. Kim Was A Custodial Interrogation.**

To safeguard the un-counseled, persons subjected to custodial interrogation are entitled to receive from the government certain preliminary warnings regarding their constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).  The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.[3] The accused's custodial status "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).  In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Court explained the custody test as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not a liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Id.* at 112 (internal quotations omitted).  As *Keohane* suggests, courts have established that the totality of the circumstances, including the location of the interrogation, must be taken into consideration when evaluating whether the accused was in custody.  *Dickerson v. United States*,

---

[3] Courts have defined interrogation as an "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–301 (1980).  The *Innis* court explained that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

530 U.S. 428, 434 (2000) ("The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"); *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account.").

In this case, the September 24, 2009, and the March 29, 2010, meetings were custodial interrogations because the questioning occurred under circumstances in which a reasonable person would not have felt he was at liberty to terminate the interrogation and leave. *See Thompson*, 516 U.S. at 112. Although both encounters required *Miranda* warnings, the March 29, 2010, encounter best demonstrates why Mr. Kim is entitled to relief.

First, it is clear that the government agents' questioning of Mr. Kim on or around March 29, 2010, was an interrogation within the meaning of *Miranda*. The agents posed "express questions" to Mr. Kim to which they expected answers and the agents knew, or should have known, that their questions were reasonably likely to elicit an incriminating response from Mr. Kim. *See United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997) ("[T]here is no interrogation triggering the protections of *Miranda* unless, in the totality of the circumstances, the officer's questions were 'reasonably likely to elicit an incriminating response.'"). Moreover, the questions were inherently coercive and intended, at least in part, to produce admissions of guilt. Indeed, the questions were likely intended to create new charges against Mr. Kim. *See* Motion to Dismiss Count Two (filed alongside this motion).

Second, the interrogation was conducted in a SCIF, which is an access-controlled facility intended to prevent inadvertent disclosure of sensitive compartmented information. The rules and regulations of such facilities generally require anyone without authorized access to be escorted at all times once within the facility. Based on the secured nature of the room, a

reasonable person in Mr. Kim's position would not have reasonably believed that he had the liberty to simply get up and leave the secure facility.  After all, at the time, Mr. Kim had been terminated from his previous employment and no longer had access to a SCIF.  Although courts have held that interrogations conducted in police stations are not necessarily custodial, *see, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492 (1977), the heightened security and safeguards of a SCIF create an "inherently coercive" environment.  *See New York v. Quarles*, 467 U.S. 649, 654 (1984).  In such an environment, there is tremendous compulsion or psychological pressure for the suspect to respond to questions.  *Dickerson*, 530 U.S. at 435 ("custodial police interrogation, by its very nature, isolates and pressures the [suspect]").  The *Miranda* opinion was based in part on the Court's conclusion that "custodial interrogation was 'psychologically . . . oriented' and that the principal psychological factor contributing to successful interrogation was isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner.'"  *Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976) (quoting *Miranda v. Arizona*, 384 U.S. 436, 448, 457 (1966)).  That is precisely what appears to have happened in this case.

Third, the agents never advised Mr. Kim that he was free to leave, but instead allowed him to believe that his participation in the interrogation was mandatory.  The very manner in which he was summoned to the interrogation would lead a reasonable person to believe he was in custody.  The FBI agent called Mr. Kim with a sense of urgency and informed him that they needed to meet immediately.  The immediacy of the request had the natural effect of placing Mr. Kim in an agitated state of alarm and caused him to believe that his participation in the meeting was compulsory.  When Mr. Kim proposed that the government agent come to his office, the agent rejected the offer and informed Mr. Kim that they needed to meet with him in a SCIF, a

much more formal and coercive environment.  The fact that Mr. Kim was being summoned to a secure facility on very short notice with two federal agents securing the entry and location only served to exacerbate his state of alarm.

Fourth, the agents were verbally aggressive toward Mr. Kim during the interrogation, challenged the veracity of his statements, and showed him materials that they claimed evidenced his wrongdoing.  These accusations increased not only the level of tension in the interrogation room, but also the coercive nature of the environment.  More importantly, the clear intent of the government's interrogation tactics was to coerce Mr. Kim to confess to wrongdoing.  Thus, the totality of the circumstances would cause a reasonable person to believe that he was not at liberty to terminate the interrogation.

Because law enforcement agents engaged in a custodial interrogation of Mr. Kim, he was entitled to receive, in advance of the interrogation, an appropriate *Miranda* warning regarding his rights under the Fifth Amendment to the Constitution.[4]

## II.     Mr. Kim Did Not Receive Adequate *Miranda* Warnings Before Participating In The September 24, 2009, Or The March 29, 2010, Interrogations.

It is well-established that the admissibility of an accused's statements to government investigators in a custodial setting hinges on whether the accused received adequate warnings and voluntarily waived his rights before making the statements.[5]  *See Miranda*, 384 U.S. at 475.

_____

[4]  A similar analysis applies to the questioning of Mr. Kim at his home later that same day. Indeed, throughout that interrogation, law enforcement officials continued to act in a hostile and accusatory manner and never informed Mr. Kim that he was free to end the questioning.  Also, the context—his being followed, his being confronted by six agents, and the tone and phrases the agents used—added the atmosphere of coercion.

[5]  As the *Miranda* Court established, "[n]o distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense.

(continued…)

The Supreme Court has observed that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Dickerson*, 530 U.S. at 435.  Accordingly, when questioned in a custodial setting, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).  "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.*

In *Miranda*, the Court articulated "concrete constitutional guidelines for law enforcement agencies and courts to follow."  384 U.S. at 442.  Under those guidelines, the admissibility in evidence of any statement given during custodial interrogation is dependent upon whether the law enforcement official informed the suspect that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479; *Bogle*, 114 F.3d at 1274.

No evidence has been presented that government agents provided Mr. Kim with a proper *Miranda* warning prior to questioning him on September 24, 2009, or on March 29, 2010.  Instead, the agents interrogated Mr. Kim without warning and attempted to coerce him to incriminate himself.  The agents' failure to apprise Mr. Kim of his *Miranda* rights violated his

---

The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." *Miranda v. Arizona*, 384 U.S. 436, 476–477 (1966).

constitutional rights and is grounds for suppression of any and all statements that Mr. Kim made during the course of the interrogation.

**III.     Mr. Kim Did Not Waive His Constitutional Rights.**

By failing to inform Mr. Kim of his constitutional rights prior to interrogating him, government agents deprived Mr. Kim of even an opportunity to waive those rights. While an effective waiver may allow for admission of an accused's statements into evidence, there must be facts to corroborate that such a waiver was made. "Waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). Moreover, alleged waivers of fundamental constitutional rights such as the right to counsel and the privilege against self-incrimination will be upheld only after careful inquiry into the factual basis for the alleged waiver. *Miranda* established that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

The question of whether the accused waived a constitutional right "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). When performing this inquiry, courts must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Moreover, courts must again take into account the totality of the circumstances surrounding the case. A suspect's relinquishment of the rights established in *Miranda* "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S.

412, 421 (1986). In addition, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." 475 U.S. at 421. There is simply no evidence to suggest that Mr. Kim knowingly, intelligently, and voluntarily waived his constitutional rights. Moreover, the fact that Mr. Kim was not even apprised of his constitutional rights strongly suggests that he did not intentionally waive these rights.

## CONCLUSION

Because Mr. Kim was in custody when he was interrogated on September 24, 2009, and on March 29, 2010, the government agents who conducted these interrogations were required to apprise him of his *Miranda* rights. The burden is on the government to prove by a preponderance of the evidence that its agents provided Mr. Kim with the appropriate warnings. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Moreover, for Mr. Kim's statements to be admissible, the government must prove that Mr. Kim knowingly, intelligently, and voluntarily waived his constitutional rights.

To resolve these important issues, Mr. Kim respectfully requests that this Court conduct an evidentiary hearing to assess whether his statements to law enforcement agents on September 24, 2009, or on March 29, 2010, were obtained in violation of his constitutional rights and whether those statements, as well as any evidence collected on the basis of the statements, must be suppressed.

Respectfully submitted,

Dated: January 31, 2011

_____

Abbe David Lowell, Esq. (DC Bar No. 358651)
Paul M. Thompson, Esq. (DC Bar No. 973977)
James M. Commons, Esq. (DC Bar No. 502790)

**McDERMOTT WILL & EMERY LLP**
600 Thirteenth Street, N.W.
Washington, DC 20005-3096
T:  (202) 756-8000
F:  (202) 756-8087

*Counsel for Defendant Stephen Kim*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:10-CR-225 (CKK)** |
| | ) | |
| **STEPHEN JIN-WOO KIM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## [PROPOSED] ORDER

This matter came before the Court on Defendant Stephen Kim's Motion to Suppress Statements.  Upon due consideration of the pleadings and the entire record herein, the Court finds that an evidentiary hearing is necessary to develop further facts, which are in dispute and determinative of defendant's motion.  It is hereby **ORDERED** that:

An evidentiary hearing will be held on _____, 2011 at _____.

**SO ORDERED.**


_____

COLLEEN KOLLAR-KOTELLY
United States District Judge


Date: _____, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2011, I caused a true and correct copy of the foregoing to be served via the Court's ECF filing system to all counsel of record in this matter.

/s/ Abbe D. Lowell