~~Treat as Classified~~ ███████████ ~~Contents Subject to CIPA Protective Order~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Filed with Classified
Information Security Officer
CISO _____
Date 2/11/13

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. 10-225 (CKK) |
| ) | |
| v. ) | **FILED** |
| ) | |
| STEPHEN JIN-WOO KIM, ) | JUL 24 2013 |
| ) | |
| Defendant. ) | Clerk, U.S. District & Bankruptcy Courts for the District of Columbia |

### DEFENDANT STEPHEN KIM'S SECOND MOTION TO COMPEL DISCOVERY (REGARDING OTHER CONTACTS FOR THE REPORTER)

Defendant Stephen Kim, by and through undersigned counsel, hereby moves[1] this Honorable Court for an order compelling the government to disclose the following items regarding other individuals who accessed the intelligence report at issue prior to the posting of the Rosen article on the Internet. This motion is made pursuant to Rule 16 of the Federal Rules of Criminal Procedure as well as Mr. Kim's right to exculpatory information as set forth in *Brady* and its progeny. *See Brady v. Maryland*, 373 U.S. 83 (1963).

**I.    Introduction and Relevant Facts**

Mr. Kim is charged with one count of disclosing national defense information to one not entitled to receive it in violation of the Espionage Act, 18 U.S.C. § 793(d), and one count of making false statements to a federal official in violation of 18 U.S.C. § 1001(a)(2). The Indictment alleges that "in or about June 2009," Mr. Kim disclosed the contents of a classified report "concerning intelligence sources and/or methods and intelligence about the military capabilities and preparedness of a particular foreign nation" to "a reporter for a national news

---

[1] The defense is filing three separate motions to compel discovery corresponding to the three categories of requests previously made to (and denied by) the government. This is the second of those motions. The defense is also filing a separate motion regarding the government's practice of redacting and substituting discoverable information without seeking the Court's authorization.

Treat as Classified ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Contents Subject to CIPA Protective Order

organization." Dkt. 3 at 1. As described in the defense's first motion to compel, the intelligence report at issue is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ regarding North Korea's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The reporter at issue is James Rosen of Fox News. The government alleges that Mr. Kim disclosed the contents of ▓▓▓ to Mr. Rosen, who published an article discussing North Korea's ▓▓▓▓▓ around 3:16 p.m. on June 11, 2009.

Based on the discovery provided to the defense to date, the government does not have any direct evidence that Mr. Kim disclosed the contents of ▓▓▓ to Mr. Rosen on June 11, 2009. The government has not produced any email, text message, or recorded conversation documenting the contents of any communication between Mr. Kim and Mr. Rosen on that date. Rather, the government's case against Mr. Kim hinges on the notion that an identifiable, finite number of government employees and contractors accessed ▓▓▓ prior to the posting of the Rosen article on June 11, and that Mr. Kim was the only one of those individuals who both accessed ▓▓▓ and communicated with Mr. Rosen on that date.

The government's theory has been complicated, however, by the fact that even now, three and half years after the alleged disclosure to Mr. Rosen, the government continues to unearth additional people who accessed the intelligence reports at issue prior to publication of the Rosen article. At the beginning of its investigation, the government compiled a list of <u>78</u> individuals who, according to ▓▓▓ accessed the intelligence reports at issue on June 11, 2009. Almost a year later, on May 28, 2010, an FBI agent swore in a search warrant affidavit to this Court that the investigation had revealed only <u>96</u> people who accessed the intelligence reports at issue prior

---

[2] As in the defense's first motion to compel, the term ▓▓▓ refers to both the actual intelligence report accessed by Mr. Kim and prior iterations of the same intelligence produced by the government in this case, such as the underlying ▓▓▓▓▓ and earlier versions of the intelligence report.

to the publication of the Rosen article.[3] By the time Mr. Kim was indicted in August 2010, the list had grown to 118. Almost two years later (and following several defense discovery requests), the government revealed that it had discovered a 119th person. Ironically, the 119th person identified by the government appears to have been one of the first – if not the first – person to access the intelligence reporting at issue in this case. Then, on November 30, 2012, the government disclosed for the first time that 49 additional people accessed the information at issue in the form of a ████ bringing the grand total to 168. Put simply, the government has now identified more people who were not on its original list of 78 people who accessed the intelligence reports at issue than those who were included on that first list.

Part of Mr. Kim's defense at trial will be the inherent unreliability of the government's efforts to account for all of those who accessed the intelligence report at issue prior to the publication of the Rosen article (and thus who could have spoken with Mr. Rosen). For that reason, the defense made several discovery requests concerning other individuals who may have accessed ████ prior to publication of the Rosen article on June 11. The defense will also contend that the source of the alleged disclosure was most likely someone other than Mr. Kim. For that reason, the defense requested additional information regarding several apparent leaks of intelligence ████████████ to Fox News during the same time period – a topic raised by several government employees during their interviews with the FBI. The specific requests made by the defense (and denied by the government) are described below.

---

[3] Notably, the government's sworn "list" of those who accessed the intelligence relied on the time of publication of the Rosen article as the relevant "cut-off time," *i.e.*, the time by which any alleged disclosure to Mr. Rosen must have already taken place. Prior to November 30, 2012, each of the updated "lists" provided by the government used the time of publication of the Rosen article as the relevant "cut-off time." The significance of the applicable "cut-off time" is addressed in the defense's first motion to compel discovery regarding additional source documents.

Treat as Classified ███████████████ Contents Subject to CIPA Protective Order

## II. Legal Standard

This motion to compel discovery is made pursuant to both Mr. Kim's right to exculpatory information as set forth in *Brady* and its progeny and Rule 16 of the Federal Rules of Criminal Procedure.

Under *Brady*, the defense is entitled to any information "that is 'favorable to the accused, either because it is exculpatory, or because it is impeaching' of a government witness." *United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006) (quoting *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)). The prosecution's *Brady* obligations include not only a duty to disclose exculpatory information, but also a duty to search for such information. *See United States v. Brooks*, 966 F.2d 1500, 1502 (D.C. Cir. 1992); *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005).

Under Rule 16, the defense is entitled to any information that is material to the preparation of the defense. *See United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998). Documents are material to the preparation of the defense if they help the defense ascertain the strengths and weaknesses of the government's case or aid the defendant's efforts to (1) prepare a strategy for confronting damaging evidence at trial, (2) conduct an investigation to discredit the government's evidence, or (3) avoid presenting a defense that would be undercut by the government's evidence. *Id.*; *see also Safavian*, 233 F.R.D. at 15. "[T]he documents need not directly relate to the defendant's guilt or innocence. Rather, they simply must play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment or rebuttal." *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (internal quotation omitted). "The language and the spirit of [Rule 16] are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and

Treat as Classified ███████████████ Contents Subject to CIPA Protective Order

receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).

Because the government's case against Mr. Kim involves classified information, the defense expects the government to assert a national security privilege as to some of the material described in this Motion. A defendant seeking classified information is entitled to any information that is both relevant and "at least 'helpful to the defense of the accused.'" *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) (quoting *Roviaro v. United States*, 353 U.S. 53 (1957)). To demonstrate that the information is "at least helpful" to the preparation of the defense, the defendant must show that the information is not just theoretically relevant but also "useful to counter the government's case or to bolster a defense." *United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008). "To be helpful or material to the defense, evidence need not rise to the level that would trigger the Government's obligation under *Brady*." *Id.*; *see also Mejia*, 448 F.3d at 456-57 ("[I]nformation can be helpful without being 'favorable' in the *Brady* sense.").

In a case such as this one involving cleared defense counsel, courts traditionally "err on the side of granting discovery to the defendant" and "resolve[] close or difficult issues in his favor," for two reasons. *Poindexter*, 727 F. Supp. at 1473. First, in light of the procedures yet to take place under the Classified Information Procedures Act ("CIPA"), the only question presently before the Court is whether the information sought by the defense should be disclosed to cleared defense counsel, not whether the information will be used at trial. "[B]ecause of the CIPA process, the Court will have an opportunity to address once again the issue of the materiality of classified documents that have been produced and their use as evidence" before trial. *Id.*; *see also George*, 786 F. Supp. at 16 n.9. Second, the Court has already entered a protective order in this case, which mitigates any concerns about the potential for any

Treat as Classified ███ Contents Subject to CIPA Protective Order

unauthorized disclosure of classified information. *See George*, 786 F. Supp. at 16 & n.7. For these reasons, any close question should be resolved in Mr. Kim's favor.

### III. Specific Items Requested

#### A. Document Control Records for Hard Copies of ███

The government's ability to identify who accessed ███ is based on three things: (1) electronic document access records for those government employees and contractors who viewed ███ online; (2) document control "cover sheets" or "sign-in sheets" signed by those who viewed hard copies of the report; and (3) FBI interviews regarding dissemination of the report. While electronic access records are generated automatically when one views ███ online, there is no equivalent for hard copies of the report or word-of-mouth dissemination of its contents. If hard copies were printed without a cover sheet, or if someone failed to sign a cover sheet acknowledging receipt of the information, there is no way to know who accessed the report.

The defense previously requested document control records and any other documents showing distribution and access to hard copies of ███ printed by thirteen different government employees who accessed and printed ███ prior to publication of the Rosen article on June 11, 2009. *See* Dkt. 91, Ex. 3, at 3. This request was based on electronic document access records provided by the government, which demonstrated that each of the individuals specified by the defense printed a hard copy of ███ The government responded by stating that it "considered this request resolved" because "[p]rior productions have included all 'document control records or other documents showing distribution/access to each hard copy of ███ that were identified during the government's investigation." Dkt. 91, Ex. 6, at 3.

~~Treat as Classified~~ ███████████████ ~~Contents Subject to CIPA Protective Order~~

The defense now moves the Court to order production of the requested document control records.

Contrary to the government's suggestion, its response does not resolve the defense's request. Although the government states that it has produced all document control records for hard copies of ███ "identified during the government's investigation," the electronic document access records produced by the government indicate that thirteen individuals printed hard copies of ███ prior to publication of the Rosen article on June 11, 2009. These hard copies and their corresponding sign-in pages or other document access records have not been produced to the defense. Thus, the defense cannot determine who accessed these printed copies or whether they were circulated without any control or record of their dissemination.

Moreover, for six of these thirteen individuals, the government has not produced any FBI-302s, agent's notes, or other interview materials indicating that they were interviewed during the government's investigation. The government has therefore provided no basis for the defense to assume that investigating agents have asked for the hard copy reports and sign-in sheets generated by these individuals, even though the electronic access records plainly indicate that these individuals printed hard copies of ███ This information is "relevant and helpful" to the defense, as anyone who accessed the information contained in ███ – whether by hard copy or electronically – prior to the publication of the Rosen article might have shared that information with Mr. Rosen. The defense thus moves the Court to order the production of document control records and any other materials related to the printing and dissemination of hard copies of ███ by the thirteen government employees identified by the defense. In the event that such hard copies and document control records have been destroyed, the defense requests that the government so notify the defense and the Court.

~~Treat as Classified~~ ███████████████ ~~Contents Subject to CIPA Protective Order~~

B. Other Leaks of Intelligence ███████████

The defense previously requested additional information regarding "any formal requests made by an agency in the intelligence community, the Department of Defense, or the White House (including the President's national security advisors) to the Department of Justice for a formal investigation of the potential leak of intelligence ████████████ from June 2008 through June 2010."[4] Dkt. 80, Ex. 10, at 4-6. This request was based on FBI-302s and agent's notes from several interviews with high-ranking members of the intelligence community, who stated that the alleged disclosure in the June 11 Rosen article was just one in a series of leaks of intelligence ███████████ during the same time period. The government denied this request, stating that it "calls for the production of classified material to which the defense is not entitled." Dkt. 80, Ex. 16, at 2. The defense now moves the Court to order the production of the requested materials.

Importantly, the government does not claim that no such documents exist, as it did for several other defense requests. The defense therefore assumes that the government has information in its possession, custody, and control regarding additional leaks of intelligence ███████████ within one year of the alleged disclosure in this case.[5] The only question is whether such information is "relevant and helpful" to Mr. Kim's defense.

---

[4] To narrow its request, the defense defined the phrase "intelligence ███████" to mean ████████████████████████████████████████████████████ ██████████████████ See Dkt. 80, Ex. 10, at 4-5. The defense also specifically requested information regarding ██████████████████████████████████████████ ████████████████ Id. at 5-6. ███████████████ were raised by members of the intelligence community during the government's investigation of the alleged disclosure in this case.

[5] This assumption draws further support from the FBI's interview with Daniel Russel, the National Security Council's Director for Japan and Korea. When asked about the alleged disclosure in this case, Mr. Russel stated that the June 11 Rosen article "was ██████

-Treat as Classified- ▓▓▓▓▓▓▓▓▓▓▓▓ Contents Subject to CIPA Protective Order-

As to that question, such information is "relevant and helpful" to the preparation of Mr. Kim's defense, as it tends to prove that someone other than Mr. Kim was actively leaking intelligence ▓▓▓▓▓▓▓ to Fox News during the same time period. Although the government has attempted to build a circumstantial case against Mr. Kim, the fact remains that it has no direct evidence that Mr. Kim shared the contents of ▓▓▓ with Mr. Rosen on June 11, 2009. The discovery provided to date also makes clear that the government has no foolproof means of determining who accessed the intelligence at issue prior to publication of the Rosen article, as the government cannot account for dissemination of the information by hard copy or word-of-mouth. The defense should therefore be entitled to discovery that tends to demonstrate that someone other than Mr. Kim was actively disclosing classified information ▓▓▓▓ ▓▓ to Fox News during the same time period in which the charged disclosure took place.

Moreover, what little discovery the government has produced regarding such additional leaks supports the appropriateness of this request. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ sent an email to James Rosen asking him to "check with [his] sources" (plural) about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ Ex. 3 ▓▓▓▓▓ Email). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ there is no evidence that Mr. Kim ever responded to the inquiry or discussed ▓▓▓▓▓▓▓▓ with Fox News.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 1 (FBI-302 for Daniel Russel). According to the notes from this interview (though not the agent's report), Mr. Russel also apparently referred to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Ex. 2 (Agent's Notes for Interview of Daniel Russel). ▓▓▓▓▓▓▓▓▓ was one of the topics specifically cited in the defense's request. *See* Dkt. 80, Ex. 10, at 5.



~~Treat as Classified~~ ~~Contents Subject to CIPA Protective Order~~

however, Fox News ran a story

The story, which apparently contained classified information reported that the United States

The ▮▮▮ reinforces the defense's reasonable belief that some source other than Mr. Kim was actively providing classified information ▮▮▮ to Fox News. Such information is "relevant and helpful" to Mr. Kim's defense, as the existence of Ms. Griffin's sources casts substantial doubt on the government's theory that Mr. Kim served as Mr. Rosen's source for the June 11 article. The defense thus moves the Court to order the production of the requested information regarding additional leaks of intelligence ▮▮▮ during the same time period.

C. Other Investigations of NSC Officials

Repeated references to additional leaks of intelligence ▮▮▮ during the same time period also led the defense to request information regarding any other investigation for the unauthorized disclosure of national defense information of any individual who either accessed the intelligence at issue prior to publication of the Rosen article or was in contact with Mr. Rosen on June 11, 2009. See Dkt. 80, Ex. 10, at 12.[6] On November 19, 2012, the defense

---

[6] Through the meet-and-confer process, the parties were able to resolve this request with respect to those individuals who, according to the government, accessed the information at issue prior to publication of the Rosen article. See Dkt. 80, Ex. 16, at 6. At the time of this initial request, the government had identified only 118 employees and contractors who accessed the information at issue prior to publication of the Rosen article. Since that time, the list has grown by almost 50%, from 118 to 168. The defense assumes that the government has searched for the same documents with respect to the additional fifty individuals and concluded that no such documents

~~Treat as Classified~~ ███████████████ ~~Contents Subject to CIPA Protective Order~~

requested such information with respect to three National Security Council officials, John Brennan, Mark Lippert, and Denis McDonough. *See* Dkt. 91, Ex. 3, at 3. The government denied this request, stating that it "calls for the production of <u>material</u> to which the defense is not entitled." Dkt. 91, Ex. 6, at 3 (emphasis added). Notably, the government does not claim that this request calls for the production of *classified* material to which the defense is not entitled, so any heightened standard of discoverability applicable to classified information does not apply to this request. The defense now moves the Court to order production of the requested information regarding Messrs. Brennan, Lippert, and McDonough.

Based on the discovery provided by the government to date, two important things can be said about the involvement of Messrs. Brennan, Lippert, and McDonough in this case. First, on June 11, 2009, all three worked in the NSC offices at the White House, and were thus surrounded by colleagues who had accessed the intelligence report at issue earlier in the day. Several hard copies of ███ had been printed by (or for) NSC officials at the White House prior to publication of the Rosen article, and the intelligence community had also ████████████ ██████████████████████████████████████████████████████████ *See* Defendant's First Motion to Compel at 17. Given the seniority of their positions and the government's inability to account for dissemination of the information via word-of-mouth and hard copy, it is reasonable to assume that all three named NSC officials had access to the contents of ███ prior to publication of the Rosen article on June 11, 2009.

Second, Messrs. Brennan, Lippert, and McDonough all worked in the same NSC office in which someone (the government has been unable to determine who) communicated with Mr. Rosen prior to publication of the Rosen article on June 11, 2009. Mr. Rosen's phone records

---

exist, with the exception of the polygraph information provided by the government on November 30, 2012. *See* Dkt. 91, Ex. 4, at 6.

Treat as Classified ███████████████ Contents Subject to CIPA Protective Order

show that at 2:33 p.m., he placed a call to a number associated with Mr. McDonough, which was also visible at the desks of Messrs. Brennan and Lippert. At 2:36 p.m., someone at the NSC placed a call to Mr. Rosen and spoke with him for several minutes. According to FBI internal reports, no one at the NSC remembers that call, but the "trunk line" associated with the call is also associated with Messrs. Brennan, Lippert, and McDonough. It is therefore reasonable to assume that at least one of those three spoke with Mr. Rosen prior to publication of the Rosen article on June 11, 2009.

Because Messrs. Brennan, Lippert, and McDonough therefore had both access to the intelligence at issue and contact with Mr. Rosen on June 11, 2009, the defense requested information related to any other investigation for the unauthorized disclosure of national defense information of these three individuals, just as it had done for the other government employees and contractors involved in the investigation. Such information is relevant to the preparation of Mr. Kim's defense, as it goes directly to whether other individuals who communicated with Mr. Rosen on June 11 have engaged in the unauthorized disclosure of national defense information or maintained ongoing relationships with the news media. Moreover, because part of the government's case against Mr. Kim is that any such disclosure was "unauthorized," such information may also shed light on the extent to which NSC press officials like Mr. McDonough were in fact <u>authorized</u> to speak to the press on these issues. The defense thus moves the Court to order production of the requested materials, particularly as they do not appear to be classified.

### D. Other Investigations of John Herzberg

On November 19, 2012, the defense requested the same information regarding investigations for the unauthorized disclosure of national defense information with respect to John Herzberg, the Director of Public Affairs in Mr. Kim's Bureau at the State Department. *See*

Dkt. 91, Ex. 3, at 3. The government denied this request, stating that it "calls for the production of material to which the defense is not entitled." Dkt. 91, Ex. 6, at 3 (emphasis added). As with the request above, the government does not claim that this request calls for the production of classified material, so any heightened standard of discoverability applicable to classified information is inapplicable. The defense now moves the Court to order production of the requested information regarding Mr. Herzberg.

The defense's request is based on the government's recent production of a series of emails between Mr. Herzberg and Mr. Rosen. Between April 1, 2009, and July 22, 2009, Mr. Rosen and Mr. Herzberg exchanged at least 102 emails, several of which discussed recent developments in North Korea. *See, e.g.*, Ex. 5 (Herzberg Emails). These emails make clear that Mr. Herzberg regularly disclosed sensitive information to Mr. Rosen, even though he repeatedly told the FBI that he had not done so. Moreover, like Mr. Kim, Mr. Herzberg worked at the State Department, and therefore may have obtained the information at issue in this case by word-of-mouth or hard copy from any one of a number of State Department employees who accessed ▓▓▓ on June 11, 2009.

In light of the personal relationship between Mr. Herzberg and Mr. Rosen, their frequent communications, and Mr. Herzberg's role as the press officer in the same State Department bureau as Mr. Kim, the defense requested information related to any investigation for the unauthorized disclosure of national defense information of Mr. Herzberg. Such information is relevant to the preparation of Mr. Kim's defense, as it goes directly to whether other individuals in regular communication with Mr. Rosen have engaged in the unauthorized disclosure of

~~Treat as Classified~~ ████████ ~~Contents Subject to CIPA Protective~~ Order

national defense information. The defense thus moves the Court to order production of the requested material, particularly as it does not appear to be classified.[7]

WHEREFORE, for the reasons set forth above and any others appearing to the Court, the defendant seeks an Order compelling the government to produce the following materials forthwith:

1) Any document control records or any other documents relating to the distribution of, and access to, hard copies of ████ printed by the thirteen government employees identified by the defense; or, if said documents have been destroyed, notice thereof.

2) Any documents relating to any formal requests made by an agency in the intelligence community, the Department of Defense, or the White House (including the President's national security advisors) to the Department of Justice for a formal investigation of the potential leak of intelligence ████████ ████ from June 2008 through June 2010.

3) Any documents relating to any investigation into the unauthorized disclosure of national defense information by John Brennan, Mark Lippert, or Denis McDonough.

4) Any documents relating to any investigation into the unauthorized disclosure of national defense information by John Herzberg.

Respectfully submitted,

DATED: February 11, 2013

/s/ Abbe David Lowell
Abbe David Lowell (DC Bar No. 358651)
Keith M. Rosen (DC Bar No. 495943)
Scott W. Coyle (DC Bar No. 1005985)
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave NW
Washington, DC 20036

*Counsel for Defendant Stephen Kim*

---

[7] Presently pending before the Court is an *ex parte* motion by the government pursuant to CIPA § 4, the resolution of which could result in the production of additional discovery to the defense. On February 8, 2013, the government also advised the defense that it is still in the process of responding to several outstanding discovery requests, which the parties expect to resolve shortly. The defense respectfully reserves the right to file a supplemental motion to compel discovery, if such a motion is warranted by any additional documents produced by the government.

Treat as Classified ████████ Contents Subject to CIPA Protective Order

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 10-225 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN JIN-WOO KIM, | ) | |
| | ) | |
| Defendant. | ) | |

## PROPOSED ORDER

For the reasons set forth in Defendant Stephen Kim's Second Motion to Compel Discovery (Regarding Other Contacts for the Reporter), the government is hereby **ORDERED** to produce:

(1) Any document control records or any other documents relating to the distribution of, and access to, hard copies of ███████ printed by the thirteen government employees identified by the defense: or, if said documents have been destroyed, notice thereof.

(2) Any documents relating to any formal requests made by an agency in the intelligence community, the Department of Defense, or the White House (including the President's national security advisors) to the Department of Justice for a formal investigation of the potential leak of intelligence ███████ ███████ from June 2008 through June 2010.

(3) Any documents relating to any investigation into the unauthorized disclosure of national defense information by John Brennan, Mark Lippert, or Denis McDonough.

(4) Any documents relating to any investigation into the unauthorized disclosure of national defense information by John Herzberg.

_____
Hon. Colleen Kollar-Kotelly

Treat as Classified ████████ Contents Subject to CIPA Protective Order

8/13/12 ~~Treat as Classified~~  ~~Contents Subject to CIPA Protective Order~~
Hotmail Print Message

## RE: Your Story on Special Report

John Herzberg (john_herzberg@hotmail.com)
Wed 4/15/09 2:25 PM
James Rosen (james.rosen@foxnews.com)

My physicist experts tell me that if the Norks want to maximize PU from reprocessing fuel rods, they would have to run the reactor for 3 years, but after as little as 1 year there could be enough PU for making reprocessing worthwhile.

From: James.Rosen@FOXNEWS.COM
To: john_herzberg@hotmail.com
Date: Wed, 15 Apr 2009 11:04:31 -0400
Subject: RE: Your Story on Special Report

Cool -- thanks for that.

From: John Herzberg [mailto:john_herzberg@hotmail.com]
Sent: Wednesday, April 15, 2009 11:22 AM
To: Rosen, James
Subject: RE: Your Story on Special Report

David Albright is quoted in an AP story that it would take a year for the Norks to begin reprocessing PU. That is correct only with regard to starting from scratch with fresh fuel after they get the reactor up and running, but ignores the spent fuel rods they now have which can be immediately reprocessed once they have re-mantled the facility, which they demonstrated they could do in 3 weeks last Fall.

From: James.Rosen@FOXNEWS.COM
To: john_herzberg@hotmail.com
Date: Wed, 15 Apr 2009 11:01:56 -0400
Subject: RE: Your Story on Special Report

Momentarily!

From: John Herzberg [mailto:john_herzberg@hotmail.com]
Sent: Wednesday, April 15, 2009 10:50 AM
To: Rosen, James

9/13/12 ~~Treat as Classified~~ ██████ Hotmail Print Message ██████ ~~Contents Subject to CIPA Protective Order~~

Subject: Your Story on Special Report

I was at a very noisy cocktail party last night and although I saw your piece on Special Report, I could not hear it. Any chance of you sending the script to me at herzbergjm@state.gov ?

Windows Live™ SkyDrive: Get 25 GB of free online storage. Check it out.

Hotmail® is up to 70% faster. Now good news travels really fast. Find out more.

Windows Live™ SkyDrive: Get 25 GB of free online storage. Check it out.

## DPRK

**Rosen, James** (James.Rosen@FOXNEWS.COM)
Mon 4/27/09 6:15 PM
'John Herzberg' (john_herzberg@hotmail.com)

Johnny: I thought you might find of interest the transcript of my interview with Secretary of State Clinton, conducted this past Saturday in Baghdad. Note her response to my question about whether the U.S. government believes DPRK is presently proliferating to any terrorist entities or state sponsors of terrorism. Her unequivocal response surprised me, as I suspect it will you. I asked because, as you are surely aware, there are many recent and credible reports, in both official and open sources, of such connections between DPRK and Iran, Hezbollah, the Tamil Tigers, et al. Best regards, James

U.S. Department of State

Office of the Spokesman

(Baghdad, Iraq)

For Immediate Release                                April 25, 2009

2009/T7-?

| | |
|---|---|
| From: | Herzberg, John M |
| Sent: | Tuesday, June 02, 2009 7:29 AM |
| To: | Rosen, James |
| Subject: | DPRK Succession |

## DPRK ANOINTS KIM JONG-IL'S YOUNGEST SON AS SUCCESSOR

(SBU) The DPRK's main institutions and overseas missions have been asked to pledge loyalty to Kim Jong-un, media report. Embassy Seoul notes all talk of succession is highly speculative, and comments it is unusual to appoint the youngest child as successor in a country that values seniority. According to press, Kim Jong-il's eldest son had been considered the favorite to succeed his father until he was caught trying to enter Japan on a fake passport in 2001. *(Ops/Embassy Seoul telcon, Reuters)*

1